## THE SECOND MUNICIPALITY OF NEW ORLEANS *v.* MORGAN.

The ordinance of the Council of the Second Municipality of New Orleans, of April, 1843, imposing a special tax on real estate within the limits of that Municipality, was passed in violation of the laws defining the powers of the Council, and cannot be enforced. Acts of 17th Feb. 1805, s. 6; 10th March, 1834, s. 5; 8th March, 1836; 18th March, 1839, s. 6. Nor can the two first sections of the ordinance be enforced alone; being *entire*, and some of its provisions illegal, the whole ordinance is void.

The report of a committee, presented with an ordinance, and adopted with it, may be regarded as a preamble, showing the cause and reason of its enactment.

The 5th section of the statute of the 10th March, 1834, by fixing the penalty for any delay in the payment of taxes imposed by the corporate authorities of New Orleans, divested the corporation of all discretion or power over the subject.

Since the passage of the act of 18th March, 1839, s. 6, the Councils of the Municipalities of New Orleans have been prohibited from issuing, for the purpose of borrowing money, any obligation having more than one year to run, unless specially authorized by the legislature.

An ordinance, or law, is *entire*, when each part has a general influence over the rest. In such a case, if one part be void, the whole is void. An ordinance, or law, can be partly good and partly bad, only where the parts are in themselves entire, and distinct from each other.

APPEAL from the Commercial Court of New Orleans, *Watts*, J. *Rawle* and *R. Hunt*, for the plaintiffs. *R. M. Carter* and *Grymes*, for the appellant.

The judgment of the court was pronounced by

ROST, J.* The charter of the city of New Orleans provides that the Mayor and City Council shall have power to raise by tax, in such manner as to them may seem proper, upon the real and personal estate within the said city, such sums of money as may be necessary to supply any deficiency for the lighting, cleaning, paving and watering the streets of the said city; for supporting the city watch, the levée of the river, the prisons, work-houses and other public buildings, and for such other purposes as the police and good government of said city may require.

An act passed in 1813 further authorizes the Mayor and City Council, to lay such taxes as they may judge necessary to defray the expenses of the public works.

The 5th section of an act passed in 1834, provides that in default of payment of the city taxes, the Mayor and City Council shall recover from the delinquents eight per cent interest on the amount thereof, from the day on which the same fell due, or ought to have been paid.

In 1836 the old corporation was divided into three distict municipalities, and each municipality invested with the taxing power previously existing.

At the time of the separation, the corporation was heavily in debt, and the municipalities went on, without any express powers to that effect, borrowing large sums of money, guaranteeing the payment of bonds, and associating themselves in the undertakings of other corporations and of individuals, till the year 1839, when the legislature, to remedy that state of things, ordained as follows:

---

* KING, J., did not concur with the majority of the court in the judgment pronounced in this case. EUSTIS, C. J., having been of counsel, did not sit on its trial.

Second Muni-
cipality of
New Orleans
v.
Morgan.

that "hereafter, it shall not be lawful for either of the Councils of the munici-palities of the city of New Orleans to issue its obligations having longer than one year to run, for the purpose of borrowing money, without the special authorization of the legislature; nor shall it be lawful for said Councils to endorse or guarantee any bond or other obligation for any incorporated company, association or individual, nor to be interested in any. manner, directly or indi-rec'ly, in the responsibility or undertakings of such companies, associations or individuals, without being first authorized by law; provided that the loans or emissions of bonds of either of the municipalities now authorized by ordinances, or resolutions, anterior to the passage of this act, shall not be affected by any of the provisions contained in it."

In April, 1843, the Council of Municipality No. 2, finding it necessary to re-deem the paper circulation issued by them during the derangement of our currency, passed the following ordinance :

"1st.  Be it ordained, that in the exercise of the authority vested in the Mayor and City Council, by the 6th section of an act to incorporate the city of New Orleans, approved 17th February, 1805, and by the second section of an act amendatory thereof, approved March 8th, 1836, a special tax on all the real estate, situated within the taxable limits of this Municipality, of one dollar on every one hundred dollars, is hereby imposed on the value of real estate, as ascertained by the last assessment, in 1842; and the treasurer is hereby authorized and required to collect said tax, immediately after the first day of May next.

"2nd.  Be it further ordained, that the special tax imposed by the preceding section, if not paid into the treasury within ninety days succeeding the first of May next, in addition to said tax, the parties in default shall pay eight per cent per annum interest on said tax, conformably with the 5th section of an act approved March 10th, 1834, explaining the extent of the powers vested in the Mayor and City Council of New Orleans.

"3rd.  Be it further ordained, that all persons or corporations, owners of real estate, taxed by the first article of this ordinance, and who shall pay said tax into the treasury in municipality notes, funded certificates, or in specie, within six months from the first day of May next, shall, on exhibiting their tax receipt to the treasurer. be entitled to receive a treasury note, or treasury notes, for the amount of such receipt, bearing interest at the rate of six per cent per annum; and the treasury notes so issued shall be signed by the treasurer, and shall be countersigned by the comptroller, who shall, as well as the treasurer, keep an exact account thereof; and each note shall have on its face the words 'Treasury note, issued in reimbursement of special tax of 1843.' These treasury notes shall be of three classes, and payable in 1845, 1846 and 1847. None of the second class shall be issued until the first is taken, which shall not exceed $70,000, nor of the third class till the second is taken, which shall not exceed $70,000, and those last issued shall constitute the third class.

"4th.  Be it further ordained, that the treasury notes issued under this ordinance shall be receivable by the treasurer in payment of all debts which were due to the treasury on the first day of January last, and yet remain unpaid ; also for the capital of all ground rent property belonging to the Muni-cipality ; and said notes shall be received in payment of all sums due to the treasury, at any time during the year within which they are payable,

" 5th. Be it further ordained, that immediately on the receipt of the muni-cipal notes and certificates, both those now in circulation, and those to be issued in payment of the foregoing special tax, or of debts due on the 1st January last, or for the capital of all ground rent property belonging to the Municipality, it shall be the duty of the treasurer to cancel the same and report to the Council, weekly, the amount thus received and cancelled."

A large majority of the tax payers having complied with the requisitions of this ordinance, the two first series of treasury notes contemplated by it, and a portion of the third series, were issued in their favor. Those treasury notes were in this form :

### Treasury Note,

Issued in reimbursement of special tax of 1843, under an ordinance approved April 25th, 1843.

#### Third Series.

#### Municipality No. Two.

In the year 1847, Municipality No. Two will pay to the order of

Fifty Dollars, with interest at the rate of six per cent per annum, until paid, for value received.

No.    .              New Orleans,       18   .

        , Comptroller.                       , Treasurer.

The defendant, a property holder in the Municipality, failed to make payment within six months from the passage of the ordinance, and this action was instituted to recover unconditionally from him his share of the contribution, with interest at the rate of eight per cent, in conformity with the provisions of the act of 1834.

His answer denies the indebtedness; avers that the ordinance is illegal, and in violation of the plaintiffs' charter, of the acts of the legislature amending the same, and also of the Constitution of this State, of the United States, and of various acts of Congress.

The court of the first instance gave judgment against him, and he appealed.

The first question presented for our consideration is, whether the ordinance is, in the technical language of the law, *entire*, each part having a general influence over the rest, or whether it consists of several distinct and independent parts ?

Before entering into this inquiry, it is necessary to premise that this distinction is of English origin, and is unknown to that system of jurisprudence from which ours is derived. Under that system every law is entire, and there is no exception to the rule. Incivile est, nisi totâ lege perspectâ, una aliqua particula ejus proposita judicare vel respondere. L. 24 ff de legibus. This difference is readily explained by the formation of laws in Rome and in England.

The fundamental principle of Roman jurisprudence is, that every law originates in some preconceived rule of right, which is to be respected and enforced in all applications of the law to particular cases. It is this *mens legislatoris* to which the civilian first looks in the interpretation of laws. It is either of general or special import. But whatever be its import, it is of its essence that it should be true. A rule of right is a truth.

The *mens legislatoris* in every law being necessarily one single truth, the different parts of the law must be construed with reference to that truth, and each has a general influence over the rest. It is otherwise with the English statutes. Instead of being deduced from abstract rules of right, they are a

SECOND MUNI-
CIPALITY OF
NEW ORLEANS
*v.*
MORGAN.

succession of definite remedies applied to ascertained grievances; and accord-
ingly we find that, while the civilian seeks in the first instance the rule of right
to be enforced, the English lawyer tries to discover the grievance requiring a
remedy; and, as the legislator may have several distinct grievances in view, it
is not unusual in England to provide remedies for them by the same statute.
As we have adopted the English method in that respect, the question whether
this ordinance is entire, or not, must be determined by the rules of English
jurisprudence.

" To detect the grievance which constitutes the cause and reason of the act,
recourse may be had to the title and the preamble; as these, from their custom
of reciting the grievance or part of it, may often serve to show the general
scope and purport of the act, and the inducements which led to its enactment."
Dwarris on Statutes, page 44, 9th Law Library.

The report of the finance committee presented to the Council with the or-
dinance and adopted with it, is, to all intents and purposes, its preamble, and
shows in the clearest light the cause and reason of it.

After giving a detailed statement of the embarassments of Municipality No. 2,
and of the various means suggested for its relief, it goes on to say, that the *only*
*power* in the Council to raise money is by a direct tax, but that a direct tax, to
an amount sufficient to effect the object in view, would be exceedingly onerous,
and its collection in a great measure impracticable. The finance committee
therefore abandon all idea of the only tax they had power to impose, and recom-
mend nominally a tax, but in connection with other measures which they say
will make it exceedingly light, and probably within the reach of every owner of
property. It is impossible to say more distinctly, that those other measures
were intended to have a general and controlling influence over the two first
sections of the ordinance, which could not by themselves have been carried
into effect.

The report proceeds to develop the probable operation of the scheme pro-
posed in these words: An owner of property assessed at $10,000 will be taxed
$100. This he will pay in municipality notes, which, at ten per cent discount,
will cost him $90 in specie. He will be entitled to a treasury note, payable in
1845, for $100 with six per cent interest, for which, if he retains it until due,
he will receive $112 in specie. He will thus, *so far from being taxed*, receive
back his money and eleven per cent interest, besides avoiding the payment of
his share of the losses occasioned by the depreciated currency of the Munici-
pality. The advantage will not be as great to those who receive the notes of
1846 and 1847. Yet the investment will be advantageous, and the indirect gain
the same.

The ordinance had but one cause. Its only object was to raise a sum of
money by means of a contribution, which, so far from taxing the owners of
property, would be a profitable investment. It is of no avail that the two first
sections can stand by themselves, unless it be shown that the three last can also
stand by themselves. The emission of treasury notes bearing interest, made
without consideration, for the purpose of receiving those notes afterwards in
payment of municipality dues, is an absurdity of which the plaintiffs must be
acquitted. The ordinance under which they claim is entire. A portion of it is
manifestly void. They claim from the defendant eight per cent interest under
the act of 1834, and seek to inflict upon him, for the same cause, a penalty
equal to the whole amount of his contribution, and interest thereon at the rate

of six per cent per annum. The court is unanimously of the opinion that this cannot be. The act of 1834, by fixing the penalty for the delay in the payment of taxes, has divested the corporation of all discretion or power on the subject. That penalty can neither be increased nor diminished, and the restriction to the issue of treasury notes, in favor of those who pay within a stipulated time, is a violation of law.

But I am farther of opinion that the issue of treasury notes, payable in a term of years and bearing interest, is an attempt to evade the provisions of the act of 1839, and to do indirectly what the Municipality was prohibited from doing directly.

There are but two ways by which municipal corporations can procure money, by taxes or by loans. I assent to the definitions of a tax given by the defendant's counsel from Lord *Coke* and our late Supreme Court: "*a burthen, charge, or imposition* set on persons, or property, for public uses ; *exactions* to fill the public coffers for the payment of the debt, and the promotion of the general welfare of the country." I am unable to comprehend a tax that taxes not, a burthen that enriches those who bear it, exactions that fill the pockets of those who pay them. I agree with the late Supreme Court, in the case of the *New Orleans Navigation Company* (11 Martin's Rep. 324), that the words *tax*, *impost*, *duty*, must be confined to the idea they generally convey. The finance committee who reported the ordinance were of that opinion, when they said that a tax would be exceedingly onerous, and its collection in a great measure impracticable ; and they accordingly substituted for it a contribution which, *so far from being a tax*, was a profitable investment. As the means of Municipality No. 2 have never been doubted, I readily admit that it was as they said. But if it was a profitable investment, at the moment the treasury notes were delivered, any loss sustained in the subsequent disposal of those notes by the holders, cannot be construed into a tax. It was a voluntary act, on their part, beyond the control of the taxing power, and by which they might gain or lose. If it was not a tax, what was it? The finance committee say that it may be objected to the ordinance, that the reimbursement in the way proposed is only paying one debt by contracting another. This is the true answer to the question proposed.

When the Council found that the collection of a direct tax was not practicable, they attempted to raise money by an evasion of the act of 1839. The plea of necessity under which this was done, may avail elsewhere ; it cannot be noticed here. Courts of justice do not recognize the necessity of violating the laws. In *Haydon's* case, the Barons of the Exchequer laid down the rule in such cases, as follows :

" It was then held to be the duty of judges, at all times to make such constructions as would suppress the mischief and advance the remedy ; *putting down* all subtle inventions and evasions for the continuance of the mischief *et pro privato commodo*, and adding force and life to the cure and remedy, according to the true intent of the makers of the act *pro bono publico*. Dwarris on Statutes, 9th Law Lib., p. 43.

The rule of the civil law is precisely the same. L. 29, de leg. (1, 3). Contra legem facit, qui id facit quod lex prohibet : in fraudem vero, qui salvis verbis legis, sententiam ejus circumvenit. L. 5 C. de leg. (1, 14). Non dubium est, in legem committere eum qui verba legis amplexus contra legis nititur voluntatem. Nec pœnas insertas legibus evitabit, qui se contra juris sententiam sæva

SECOND MUNI-
CIPALITY OF
NEW ORLEANS
*v.*
MORGAN.

prœrogativa verborum fraudulenter excusat. L. 21, de leg. (1, 3), L. 64. §1, de condit. (35, 1).

It was argued at the bar that the ordinance imposed a tax in words clear and unambiguous, and that the two first sections should, under all circumstances, be enforced. This is clearly an error, for I have already shown that their pro visions cannot be enforced as an absolute tax, and that the defendant could not be compelled to comply with them, unless he was placed upon the footing of those who have paid voluntarily. In the spirit and intent of the ordinance, that tax was not *a truth:* it was a mere false pretence, and I deem it material that it should be known as such. There have been popular delusions enough of late, without giving currency to one that would pass taxation upon the people as a blessing.

If the plaintiffs can enforce in this manner a contribution of one per cent upon the assessed value of real estate, to pay $200,000 of their debts, they might, by parity of reasoning, enforce a contribution of ten per cent to pay two millions of that debt, and extend the reimbursement of it over any number of years, thus defeating, whenever it suited their purpose, the prohibition of the law.

We have been told that this was not such a borrowing of money as the act of 1839 contemplated, and that the object of the Council was not to borrow money, but to pay pressing debts. This is a distinction without a difference. Whether money be raised by taxes or obtained by loan, the presumption is that it is wanted to meet pre-existing engagements. If the prohibition of the act of 1839 was to be considered as applying to money borrowed without necessity, it would be completely inoperative. The treasury notes issued were made payable to order, and such as would be given for any loan. We cannot distinguish where the law does not. Whenever the Council finds it necessary to issue notes having more than one year to run, for the purpose of raising means, they must obtain the authorization of the legislature.

The ordinance being entire, and a part of it void, the decision of this cause presents no difficulty.

" If a by-law be entire, each part having a general influence over the rest, and one part of it be void, the entire by-law is void." Wilcock on Corporations, p. 88, 14th Law Library.

In the leading case of the *King* v. *The Company of Fishermen of Farnsham,* 8 Term Rep., p. 356, Lord *Kenyon* said: " With regard to the form of the by-law indeed, though a by-law may be good in part and bad in part, yet it can be so only when the two parts are entire and distinct from each other."

This principle has been long settled, and I have been unable to find any exception to it. The authorities cited at the bar to prove that laws and ordinances may be good in part and bad in part, are based upon laws and ordinances composed of entire and distinct parts, and have no application to this cause.

Without the rules of interpretation applicable to entire statutes, I would arrive at the same conclusion. Under the act of 1834, the court could not compel the defendant to pay without ordering at the same time the issue of treasury notes in his favor, and as I consider that issue prohibited by the act of 1839, the plaintiffs cannot recover.

A majority of the court is of opinion that the judgment of the Commercial Court must be reversed.

It is therefore ordered, adjudged and decreed that the judgment of the Commercial Court be annulled and reversed, and that there be judgment in favor of the defendant for costs in both courts.